2016 IL App (3d) 140648

Opinion filed March 29, 2016

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2016

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Rock Island County, Illinois, |
|---|---|---|
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | Appeal No. 3-14-0648 Circuit No. 12-CF-43 |
| AMBER M. SMITH, | ) ) | |
| Defendant-Appellee. | ) ) | Honorable F. Michael Meersman, Judge, Presiding. |

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Rock Island County, Illinois, |
|---|---|---|
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | Appeal No. 3-14-0649 Circuit No. 12-CF-42 |
| KRISTOPHER YOUNGMAN, | ) ) | |
| Defendant-Appellee. | ) ) | Honorable F. Michael Meersman, Judge, Presiding. |

JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Justices Carter and Holdridge concurred in the judgment and opinion.

**OPINION**

¶ 1      Defendants, Amber M. Smith and Kristopher Youngman, were each charged with one

count of unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2014)) and

one count of unlawful possession of a hypodermic needle (720 ILCS 635/1 (West 2014)). The trial court subsequently granted each defendant's motion to suppress evidence, and the State appeals on certificates of impairment. We consolidated the appeals. We reverse and remand for further proceedings.

¶ 2                                                    FACTS

¶ 3        On May 8, 2014, Smith filed a motion to suppress evidence, arguing that officers did not have probable cause or reasonable suspicion to seize her. Youngman followed suit.

¶ 4        At the hearing on Smith's motion to suppress, Officer Jack LaGrange of the Rock Island police department testified that on January 16, 2014, at approximately 4:14 p.m., he was traveling northbound on 8th Street, approaching 14th Avenue. LaGrange observed a vehicle pull immediately to the side of the road upon the driver of the vehicle seeing the officer. LaGrange then passed by the vehicle and observed a white male driver, a white female in the front passenger seat, a black male in the right rear seat, and a white female child in the left rear seat. When LaGrange circled back to the vehicle, the black male passenger was standing at the passenger side of the vehicle and abruptly walked off when he saw LaGrange return. LaGrange, a police officer for eight years, testified that it is common for people to briefly enter vehicles to conduct drug transactions. LaGrange parked his car behind the vehicle and approached the driver's side of the vehicle on foot.

¶ 5        LaGrange knew the area was known for drug activity. He asked the driver, Youngman, why he was in the area. Youngman replied that he was picking up his brother from a methadone clinic and was to meet him on 9th Street. LaGrange advised Youngman that the clinic was in the 4200 block of 14th Avenue while Youngman was in the 700 block of 14th Avenue. Youngman was "quite a ways away" from the clinic and headed in the wrong direction. LaGrange then

2

asked for the identity of the black male he had observed in the car and walking away from the car. Youngman replied that there had been no black male in the car, next to the car, or walking away from the car. LaGrange obtained the identifications of the vehicle's occupants and ran them for warrants and did license checks. Through this process, LaGrange learned that Youngman had a prior drug arrest.

¶ 6      After returning the licenses, LaGrange asked Youngman to step out of the vehicle because he did not want to talk about potential drug activity in front of the child. Youngman willingly exited the vehicle and LaGrange explained his suspicion that Youngman was lying to him. LaGrange testified that he asked Youngman when he last used heroin, and Youngman replied that he did not use heroin. LaGrange then asked Youngman to roll up his sleeves and Youngman did so, revealing track marks on his arms. When LaGrange, again, asked Youngman when he last used heroin, Youngman replied that he had used it the day before.

¶ 7      LaGrange testified, "At that time I asked him if he had anything illegal on him. He said he did not, go ahead and search me." Upon searching Youngman, LaGrange found a small tin box inside a coat pocket. Youngman immediately claimed the box was not his and that Smith, who was in the front passenger seat, must have put it there. Inside the box, LaGrange found a baggy containing a tan powder he recognized as heroin. LaGrange placed Youngman in handcuffs, sat him in his squad car, and called for another unit.

¶ 8      When Officer Jonathan Cary arrived on the scene, LaGrange spoke to Smith. Smith stated that she did not use drugs and did not know how the box came to be in Youngman's pocket. LaGrange noticed that Smith had a fresh puncture mark on her hand. Smith raised her sleeves at LaGrange's request, revealing track marks on her arms. Smith admitted to LaGrange that she had a drug problem. Because it was cold outside, Cary then had Smith sit in the back of

3

his vehicle so he could conduct a more thorough conversation. Cary testified that he interviewed Smith in the back of his squad car. Smith was not handcuffed, but he did Mirandize her. Smith agreed to talk to Cary. No details of the interview were elicited and defense counsel declined cross-examination.

¶ 9    LaGrange testified that defendants' vehicle was still parked when he pulled behind it and could have left the scene had the driver chosen to do so. LaGrange would not have pursued the vehicle because such pursuits are not allowed in Rock Island. LaGrange testified, however, that Youngman and Smith were not free to leave after LaGrange returned the licenses because he was conducting an investigation at that point. Neither Youngman nor Smith asked to leave the scene, and LaGrange never told them they were not free to leave.

¶ 10    The trial court granted Smith's motion to suppress, reasoning that LaGrange did not "have an articulable suspicion to approach the car." The court pointed out that the car had pulled over legally, and there was no evidence of traffic or license infractions.

¶ 11    The court also opined that the defendants should have been free to leave after LaGrange had run their licenses and found them to be clear. The court stated, "[Y]ou can't just ask the people to roll their sleeves up because you think they may not be telling you the truth."

¶ 12    The trial court also found that LaGrange had no reasonable, articulable suspicion to suspect Smith of committing a crime, stating, "he has no articulable suspicion to tell her to raise her shirt up to try to obtain evidence against her." Further, the court opined:

> "[H]e sure doesn't have the right to go having her roll up her
> sleeves when he has nothing else to base his investigation on other
> than a co-defendant's statement that she must have stuck
> something in his pocket. *** But just because it's in his pocket and

4

he says, Well, she must have put it there, doesn't automatically give him the right to tell her to *** start rolling her sleeves up." The State filed a motion to reconsider the ruling on Smith's motion on August 8, 2014. The trial court denied it on August 14. The State filed its notice of appeal on August 20.

¶ 13    Youngman's motion to suppress went to hearing on August 14, 2014. The prosecutor agreed that the evidence presented would be substantially the same as that presented at the hearing on Smith's motion, with the additional evidence that Youngman had been Mirandized and waived his rights before making his statement. The trial court noted that its ruling would be the same because before Youngman was Mirandized, the original stop had been unlawful. The court then stated, "[T]he State has filed *** a Motion to Reconsider or a response to the defense of what they used and I've got both of those. One is Mr. Youngman['s] and one is Miss Smith['s], but realistically they are the same." After discussing the grounds for suppression in both cases, the court stated, "[T]he Motion to Reconsider in relation to Miss Smith is denied. The defense Motion to Suppress on Mr. Youngman is allowed. The Motion to Reconsider, also filed by [the prosecutor], is denied."

¶ 14    A written order from the trial court dated December 4, 2014, states, "The state's motion to reconsider the motion to suppress was heard and denied on 8/14/2014." The State filed its notice of appeal on August 20, 2014. The record contains a motion to reconsider the ruling on Youngman's motion file-stamped August 18, 2014.

¶ 15    In their initial brief on appeal, defendants raised separate jurisdictional defects in each of their cases. Specifically, defendants contended that the appeal in Smith's case was untimely because her suppression motion was granted on July 2, 2014, but the motion to reconsider was not filed until August 8, 2014, which was 37 days after the original ruling. In Youngman's case,

5

defendants contended that the motion to reconsider, formally filed on August 18, 2014, had not been ruled upon when the notice of appeal was filed, rendering the notice of appeal inoperative.

¶ 16    After defendants filed their response brief, this court, on its own motion, ordered that the record on appeal be supplemented *instanter*. The record was supplemented with two orders from the trial court dated March of 2015. The first order reads: "On July 29th, 2014 without objection the State was given an additional 30 days to file a motion to reconsider the motion to suppress. The motion to reconsider was timely filed by the State. This will supplement the record on appeal." The second order reads: "The states [*sic*] motion to reconsider the defendants [*sic*] motion to suppress evidence is heard and denied based on the reasons stated on the record previously." This order, which is file-stamped March 26, 2015, is dated "Nunc pro tunc 8/19/2014."

¶ 17                                                   ANALYSIS

¶ 18                                                I. Jurisdiction

¶ 19    At the outset, we must address defendants' individual challenges to this court's jurisdiction. First, defendants argue that this court lacks jurisdiction over Smith's case because the State failed to timely file its notice of appeal. This failure, defendants contend, stems from the State's failure to file its motion to reconsider within 30 days. See Ill. S. Ct. R. 606(b) (eff. Feb. 6, 2013) ("[N]otice of appeal must be filed *** within 30 days after the entry of the order disposing of the motion [directed against the judgment]."). Although the trial court granted the State a 30-day extension in which to file its motion to reconsider, defendants argue that this extension was not supported by a showing of good cause.

¶ 20    The trial court's March order describing the extension of time granted to the State explicitly notes that the extension was granted without objection from Smith. Accordingly, any

error in granting the extension now claimed by defendants was not properly preserved in the trial court.  See Ill. S. Ct. R. 615(a).  Because they do not seek review for plain error, defendants have forfeited appellate review of the trial court's order granting an extension of time.  See *People v. McLaurin*, 235 Ill. 2d 478, 485 (2009).

¶ 21   Next, defendants argue that this court lacks jurisdiction over Youngman's case because the State's motion to reconsider—officially file-stamped on August 18, 2014—remained pending when the notice of appeal was filed on August 20.

¶ 22   Illinois Supreme Court Rule 606(b) (eff. Feb. 6, 2013) holds that "any notice of appeal filed before the entry of the order disposing of all pending postjudgment motions shall have no effect and shall be stricken by the trial court."  Here the notice of appeal was filed on August 20, 2014.  The final appealable order from which the State appealed was the court's written order denying the State's motion to reconsider dated August 14, 2014.  The record makes clear that the trial court was in physical possession of the State's written motion to reconsider in Youngman's case on August 14, 2014, and ruled upon the motion that same day.  For unknown reasons, however, that motion to reconsider was not file-stamped until four days later on August 18, 2014.

¶ 23   The court remedied the late file-stamp error by its *nunc pro tunc* order in March of 2015.  Pursuant to that order, the court's ruling on the State's motion to reconsider was effective as of August 19, 2014—after the motion had been file-stamped, but before the State had filed its notice of appeal.  See *Kooyenga v. Hertz Equipment Rentals*, *Inc.*, 79 Ill. App. 3d 1051, 1055 (1979) ("A *nunc pro tunc* order is an entry now for something previously done, made to make the record speak now for what was actually done then.").  Because the motion to reconsider was resolved prior to the State's filing of its notice of appeal, Rule 606(b) is inapplicable.

¶ 24                                II. Motions to Suppress

¶ 25        Turning to the merits of the case, the State argues that the trial court erred in allowing defendants' motions to suppress. Specifically, the State contends that Officer LaGrange did not seize defendants because the entire encounter was consensual. We find that LaGrange's encounter with defendants began as a consensual encounter, and only rose to the level of a seizure after LaGrange had formed the reasonable, articulable suspicion required to perform such a seizure under the fourth amendment.

¶ 26        "In reviewing a trial court's ruling on a motion to suppress evidence, we apply the two-part standard of review ***." *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). Findings of fact made by the trial court are reviewed for clear error, and only reversed if they are against the manifest weight of the evidence. *Id.* However, the ultimate decision of whether or not suppression is warranted is a question of law that is reviewed *de novo*. *People v. Harris*, 228 Ill. 2d 222, 230 (2008). "A reviewing court, however, remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief should be granted." *Luedemann*, 222 Ill. 2d at 542 (citing *People v. Pitman*, 211 Ill. 2d 502, 512 (2004)).

¶ 27        The fourth amendment of the United States Constitution and article I, section 6, of the Illinois Constitution protect individuals from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. A defendant's consent to search serves as a valid exception to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

¶ 28        Not every police-citizen encounter results in a seizure. *Immigration & Naturalization Service v. Delgado*, 466 U.S. 210, 215 (1984). "Courts have divided police-citizen encounters into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative

8

detentions, or 'Terry stops,' which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) encounters that involve no coercion or detention and thus do not implicate fourth amendment interests." *Luedemann*, 222 Ill. 2d at 544.

¶ 29     In situations where a person's freedom of movement is already restrained by some factor independent of police conduct, the appropriate inquiry when determining whether that person has been seized " 'is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.' " *Id.* at 550 (quoting *Florida v. Bostick*, 501 U.S. 429, 436 (1991)). This is the appropriate inquiry where a police officer approaches a defendant in a parked car. *People v. Gherna*, 203 Ill. 2d 165, 178 (2003); *Luedemann*, 222 Ill. 2d at 551. "It is well settled that a seizure does not occur simply because a law enforcement officer approaches an individual and puts questions to that person if he or she is willing to listen." *Luedemann*, 222 Ill. 2d at 551. Even where an officer has no basis for suspecting a particular individual, he or she may generally ask questions of them, request their identification, or request consent to search. *Bostick*, 501 U.S. at 434-35.

¶ 30     In *United States v. Mendenhall*, 446 U.S. 544, 554 (1980), the United States Supreme Court listed four factors that may be indicative of seizure: (1) the threatening presence of multiple officers; (2) the display of a weapon by an officer; (3) some physical touching of the citizen's person; and (4) the use of language or tone of voice indicating that compliance might be compelled. *Luedemann*, 222 Ill. 2d at 553. The Illinois Supreme Court acknowledged these factors in *People v. Murray*, 137 Ill. 2d 382, 390 (1990). Subsequently, the court has noted that the factors are not exhaustive, and that "a seizure can be found on the basis of other coercive police behavior that is similar to the *Mendenhall* factors." *Luedemann*, 222 Ill. 2d at 557. " ' "[*I*]n the absence of some such evidence*, otherwise inoffensive contact between a member of the

9

public and the police cannot, as a matter of law, amount to a seizure of that person.' ' " (Emphasis in original.) *Id.* at 553 (quoting *Murray*, 137 Ill. 2d at 390-91, quoting *Mendenhall*, 446 U.S. at 555). "If undisclosed, the officer's knowledge, suspicion, intent, focus, subjective view, or thought of any kind can neither influence the defendant nor affect the coercive atmosphere of the interview in any way." *People v. Goyer*, 265 Ill. App. 3d 160, 167 (1994).

> "[A] confrontation with a police officer is not a seizure on the basis that the officer's authority produces an inherent pressure to cooperate. Rather, as the leading commentator on the fourth amendment has suggested, an encounter between a police officer and a civilian 'is a seizure only if the officer adds to those inherent pressures by engaging in conduct significantly beyond that accepted in social intercourse.' " *People v. Castigilia*, 394 Ill. App. 3d 355, 358 (2009) (quoting 4 Wayne R. LaFave, Search and Seizure § 9.4(a), at 425 (4th ed. 2004)).

¶ 31 In the present case, defendants concede that, under *Luedemann*, the encounter between LaGrange and defendants was lawful at its inception. LaGrange did not require justification to approach the parked car, and the trial court erred as a matter of law in finding that Officer LaGrange lacked the required reasonable, articulable suspicion to do so. See *Luedemann*, 222 Ill. 2d at 551.

¶ 32 Defendants do, however, dispute the State's argument that the encounter was consensual in its entirety. Defendants contend that Youngman was seized for fourth amendment purposes when he was asked to exit his car, or, at the very least, when he was asked to roll up his sleeves.

10

Defendants contend that Smith was seized for fourth amendment purposes when Cary requested she exit the vehicle.

¶ 33    The record here is devoid of any of the factors listed in *Mendenhall* as indicative of a seizure rather than a consensual encounter. Though LaGrange himself testified that defendants were not free to leave because he was conducting an investigation, this sentiment, importantly, was never conveyed to defendants. See *Goyer*, 265 Ill. App. 3d at 167 (officer's undisclosed subjective intent does not affect coercive nature of encounter in any way). The record shows that each of LaGrange's requests of Youngman were, in fact, requests, rather than orders. Indeed, though defendants argue that LaGrange "requested consent to search [Youngman's] person," the evidence showed that the search was performed at Youngman's suggestion. Specifically, LaGrange testified that when he asked Youngman if he had anything illegal on him, Youngman said "go ahead and search me." Though defendants conclude that Youngman did not consent, but merely acquiesced to LaGrange's authority, it cites no objective factors, either from *Mendenhall* or similar to those found in *Mendenhall*, that could support such a conclusion.

¶ 34    Given the lack of *Mendenhall* factors in the present case, we find that Youngman's encounter with LaGrange was consensual all the way through LaGrange's search of Youngman. Youngman was not seized for fourth amendment purposes until LaGrange placed him in handcuffs. Of course, at that point, having found suspected heroin on Youngman's person, LaGrange had probable cause for Youngman's arrest.

¶ 35    Defendants assert that Smith was seized for fourth amendment purposes when a second officer arrived on the scene and requested that Smith exit the vehicle. Given the presence of multiple officers and the clear demonstration of authority exerted over Youngman at that point,

11

we agree that Smith was seized when asked to leave her vehicle. However, we find that the officers' actions were supported by reasonable, articulable suspicion.

¶ 36    LaGrange's suspicions were initially aroused when, in an area known for drug activity, he saw a car maneuver abruptly upon the driver seeing him. His suspicion grew when he noticed soon thereafter that an occupant had exited the vehicle, then quickly walked away upon noticing the officer. LaGrange testified that such behavior is common in drug transactions. When LaGrange questioned Youngman, Youngman's story directly contradicted what LaGrange had personally observed. LaGrange's suspicions were confirmed when he found suspected heroin in Youngman's coat pocket. At that point, Youngman expressly disclaimed ownership of the suspected heroin and told LaGrange that Smith "must have put it there." Given the totality of the circumstance here, LaGrange had much more than a "hunch" that Smith was involved in criminal activity. See *Terry v. Ohio*, 392 U.S. 1, 22 (1968) (describing reasonable, articulable suspicion necessary to justify an investigatory seizure as "more substantial than [an] inarticulate hunch[]").

¶ 37    In arguing that LaGrange's suspicion of Smith did not rise to the *Terry* standard, defendants cite *People v. Leggions*, 382 Ill. App. 3d 1129, 1131 (2008), for the proposition that reasonable suspicion requires more than simply the suspect's presence in a high-crime neighborhood. Defendants' argument merely serves to highlight the quantity of facts—beyond the presence in an area known for drug activity—that supported LaGrange's suspicion. Of course, the most serious factual difference between *Leggions* and the case at hand is the fact that drugs were actually found, then immediately attributed to Smith.

¶ 38                              CONCLUSION

12

¶ 39        For the foregoing reasons, the judgments of the circuit court of Rock Island County in case No. 12-CF-42 and case No. 12-CF-43 are reversed and each cause is remanded for further proceedings.

¶ 40        Judgments reversed.

¶ 41        Causes remanded.